UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

COURTNEY R. BROWN, JR. D/B/A
THE HAIR FACTORY,

Plaintiff,

v.

AMERICAN HAIRGOODS IMPORTER
ASSOCIATION; AMERICAN BEAUTY
SUPPLY ASSOCIATION; NATIONAL
BEAUTY SUPPLY DEALERS
ASSOCIATION; UMI, INC. D/B/A BEAUTY
TIMES; and each of these organization's
owners and members, collectively,

Defendants.

_____/

**COMPLAINT**

**JURY TRIAL
DEMAND**

## **INTRODUCTION**

1.      This action challenges one of the largest undiscovered conspiracies in United States history, affecting an estimated $7 to $9 billion of commerce per year.

2.      The conspirators in this case are a group of Korean and/or Korean-American owned businesses that collectively control the United States beauty supply industry through a well-organized network and hierarchy of national and regional trade associations ("Defendants").

3.      One of the most profitable products imported and sold by the conspirators is human hair, including products made from human hair.

1

4.     Human hair is a natural product that is collected primarily from China and India.  It takes a long time for human hair to grow to the lengths that are needed for commercial processing and, due to its personal nature, there is a finite supply of genuine human hair available in the world at any given point in time.

5.     In the United States, human hair is primarily used by Black women to augment their natural hair styles.  Hair stylists and salons braid or sew wefts of human hair ("extensions") into customers' scalps using various methods ("weaves") and, while not as popular now as thirty years ago, some human hair is also made into wigs.

6.     Virtually all of the commercially available human hair in the United States originates from China, Korea, India or Indonesia.  Raw, unprocessed hair is cleaned, sorted and packaged in these countries before it is imported into the United States.

7.     While hard to specifically identify because they are all closely held private companies, Plaintiff believes that there are approximately 10 major manufacturers and processors of bulk human hair in the world.   These manufacturers, some of which are incorporated in the United States, import their products into the United States through a closed network of about 55 importers/wholesalers, some of which are the manufacturers' wholly-owned subsidiaries.

8.      Because the manufacturers and importers only work only with each other and because most of the manufacturers and importers/wholesalers are owned by the same Korean or Korean-American families, these entities will collectively hereinafter be referred to as the "Wholesalers."

9.      Once in the United States, human hair is consigned by the Wholesalers to a network of approximately 10,000 beauty supply outlets (the "Retailers").   The Retailers, which are typically small brick and mortar operations located in urban areas, are also predominantly owned by Koreans and/or Korean-Americans.

10.     Until recently, the Wholesalers and Retailers faced little competition in the market for the sale human hair and they steadily built and expanded the reach of their enterprise to blanket the United States.

11.     Together, the Wholesalers and Retailers control an estimated 85% of the U.S. beauty supply market, but with respect to the sale of human hair, their dominance and market share is even higher because there are no true substitutes or competing U.S. sources or suppliers for genuine human hair.

12.     Through a variety of committees, trade associations, regular meetings, rules, Korean-language publications and websites, the Wholesalers and Retailers fix prices, coordinate business activities, and collectively police and protect the industry for themselves.

13.    These practices, as detailed more fully below, include everything from market allocation and group boycotts; to money laundering and tax evasion.  While much of this enterprise and conspiracy's activities are blatantly illegal, the Wholesalers and Retailers have successfully concealed their wrongdoing by, among other things, mainly transacting business in cash, by communicating in Korean, and by associating and affiliating only with other known Korean-owned businesses.

14.    Even so, the success and spread of this multi-billion dollar per year enterprise has attracted potential competitors.  For example:

15.    In late 2009, an Arab businessman acquired a contract to open a series of beauty supply outlets inside Walmart stores.  The Retailers, unable to stop this encroachment on their own, enlisted the help of the Wholesalers to jointly boycott this potential competitor.  The would-be competitor was not allowed purchase supplies or hair products from any of the Korean-owned Wholesalers and predictably was driven out of the market.

16.    In 2010, Plaintiff, a Black-owned retailer of beauty supplies, experienced a nearly identical group boycott when Plaintiff approached these same Wholesalers to begin acquiring commercial quantities of human hair to sell in Metro-Detroit.

17.     In August 2011, a Chinese company, which already supplied and processed human hair, tried to enter the U.S. market.  The Wholesalers, who were powerless to stop this encroachment on their own, enlisted the help of the Retailers to collectively boycott the Chinese producers' products.  Without the support of the 10,000 Korean-owned Retailers, the Chinese producer had no choice but to abandon its hope of selling human hair in the U.S.

18.     Plaintiff's experience in this industry mirrors the experiences of other Black-owned beauty supply retailers.  In fact, two movie documentaries chronicle the plight and irony of Black-owned beauty supply retailers not being able to sell hair products to Black customers in their own communities.[1]

19.     These are but a few examples of the lengths the Wholesalers and Retailers have gone to to protect their mutual and highly profitable enterprise, and

---

[1] Aron Ranen's 2006 documentary *Black Hair* is available on YouTube® at:

http://www.youtube.com/watch?v=p96aaTSdrAE (Part 1)
http://www.youtube.com/watch?v=LWeLiXHcSyU (Part 2)
http://www.youtube.com/watch?v=azfEeDRvdlc (Part 3)
http://www.youtube.com/watch?v=m67P2kT7TzQ (Part 4)
http://www.youtube.com/watch?v=PT-nX25UrsI (Update 1)
http://www.youtube.com/watch?v=u0vyo6nwhuU (Update 2)

An HBO documentary *Good Hair* (2009) is also available through most movie rental providers.  A synopsis of that film can be found on HBO's website at:
http://www.hbo.com/movies/good-hair#/movies/good-hair/synopsis.html

most of this illegal coordination is conducted through trade association meetings or events sponsored by Defendants.

20.     For his part, Plaintiff seeks to permanently enjoin Defendants' illegal, coordinated business practices so he and other potential competitors may finally compete in this market on a free and open basis.

21.     Plaintiff also seeks to recover more than $1 million in lost business profits he has sustained as a result of the illegal activities and violations alleged herein, which damages are required to be trebled according to law.

## JURISDICTION AND VENUE

22.     Plaintiff brings this action pursuant to Section 4 of the Racketeer Influenced and Corrupt Organization Act, 28 U.S.C. § 1961 *et seq*. (Count I) and pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (Counts II and III).

23.     Plaintiff has been injured, and threatened with injury, in their business and property as a result of Defendants' unlawful enterprise, combination and conspiracy.

24.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964(a) and (c), pursuant to 28 U.S.C. §§ 1331 and 1337(a), and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

25.    Venue is proper in this District pursuant to Section 5 of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965, and pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26.

26.    Defendants' members each distribute and sell beauty supplies and human hair throughout the United States, including in this District, and much of the conduct alleged in this Complaint took place in this District, including price fixing, market allocation, group boycotts -- including the group boycott of Plaintiff -- money laundering, mail fraud, customs fraud, tax evasion and product mislabeling.

27.    Venue in this District is also proper pursuant to 28 U.S.C. § 1391(b), (c), and (d).

## INTERSTATE COMMERCE

28.    Defendants' members are systematically engaged in interstate commerce and activities substantially affecting interstate commerce.  The illegal enterprise, combination and conspiracy alleged in this Complaint includes hundreds of affiliated and independent companies and business persons located throughout the United States.

29.    The beauty supplies and human hair in question are marketed and sold in nearly every major city in the United States, including Detroit, and those products are all imported from Southeast Asia before being distributed across state

lines from the major shipping ports to over 10,000 U.S. Retailers.  Conversely, the money from the sales of these products flows across state lines through the U.S. Mail or U.S. banking system, back to the Wholesalers and their families.

30.    The conduct alleged in this Complaint also impacts foreign commerce with respect to the importation of goods and workers and the exportation of Defendants' and their co-conspirators' profits in the form of U.S. currency or investments.

## PARTIES

### Plaintiff

31.    Plaintiff Courtney R. Brown, Jr. is a resident of Southfield, Michigan, and owns and operates a retail beauty supply store under the trade name The Hair Factory.  Mr. Brown also owns and operates an internet hair website called www.HairSwagga.com.

32.    The Hair Factory is located at 16311 West 7 Mile Rd., Detroit, Michigan 48235.

### The AHIA

33.    Defendant American Hair Goods Importers Association (AHIA), also known as the Korean American Hair Goods Importers Association, is a Pennsylvania non-profit corporation registered at 1001 Pike Ridge, Conshohocken, Pennsylvania 19428.  Current officers of the AHIA include President Chan Sik

Park, and the AHIA's main offices are located at 120 Moonachie Ave., Moonachie, New Jersey 07074.  The AHIA with 30 to 35 Wholesaler members is the largest association of Korean beauty supply manufacturers, importers and wholesalers in the United States.[2]

### The NBSDA

34.     Defendant National Beauty Supply Dealers Association (NBSDA) is a New Jersey non-profit corporation headquartered at 7 Broad Avenue, Suite 201, Palisade Park, New Jersey 07650.  The NBSDA and its membership is the largest association of Korean beauty supply Retailers in the United States.

35.     The NBSDA is the parent association of, and carries out its mission and business through, approximately thirty regional chapters in Arkansas, California, Northern California, Sacramento, Connecticut, Washington DC, Indianapolis, Baton Rouge, New Orleans, Michigan, St. Louis, Mississippi, North Carolina, New Jersey, Northern New York, Cleveland, Alabama Montgomery, Central Pennsylvania, South Carolina, Memphis, Nashville, Houston, Richmond, South Virginia, Georgia and Chicago.

36.     The NBSDA was formed in 1990 and is also sometimes referred to as the National Federation of Beauty Suppliers (NFBS) or the U.S. Beauty Supply Association.  Current officers of the NBSDA include President Bu Ho Chu; Chief

---

[2] A list of AHIA members is available at http://www.wignews.com/memofahia.htm

Vice President Jung Hyun Yoo, New Jersey Chairman Yong Jung Kim, Manager Hye Soo, Chairman of Modification Jae Choon Lee, and Consultant Hyn Suhk Chang.

37.    The NBSDA's stated purpose is the "Exchange of Business Related information and Rejection of Excessive Competition through the Fellowship among the Beauty Supply Business Owners in the United States" and one of the NSBDA's major activities is a "Joint Response Regarding the Entrance of Other Race(s) and Searching the Method to Expand the Market."

38.    In the event that each of the thirty chapters of the NBSDA are separate entities, including, but not limited to the Georgia Beauty Supply Association and the South Carolina Beauty Supply Association, Plaintiff intends to add these associations as additional defendants.

   *The ABSA*

39.    Defendant American Beauty Supply Association (ABSA), which is also known as the Korean Beauty Supply Association, is headquartered 2101 South Vandeventer Avenue, St. Louis, Missouri 63110.  The ASBA is a spin-off of the NBSDA and since 2007 has represented the interests of several thousand Retailers in the Midwest.

### *Beauty Times and BeautyTimes.com*

40.     Defendant UMI, Inc. d/b/a *Beauty Times*, www.beautytimes.com and Beauty Expo is a website, trade publication and annual beauty expo that facilitates illegal communication and collaboration among and between Wholesalers and Retailers.   UMI is a Missouri corporation headquartered at 10725 Midwest Industrial Boulevard, St. Louis, Missouri 63132 and its Chief Executive Officer is Kaysong Song Lee.

41.     The pages of Beauty Times written in English feature product advertisements and general news items like lists of upcoming events and trade shows.   The pages of Beauty Times written in Korean are very different, and contain candid articles, interviews and reports about coordinated pricing structures; agreed upon market restraints and territorial sales restrictions; sales and business dealings with other (non-Korean) ethnicities; threats to the industry; the fear of enforcement action by U.S. authorities; the results of lawsuits against AHIA's, NBDSA's or ASBA's members; etc.

42.     Beauty Times also acts as a clearinghouse for the meetings and agreements reached by the AHIA, NBSDA and ABSA, and because access to the site and subscriptions are only available to recognized Korean Wholesalers or Retailers, these publications ensure both widespread dissemination of important information and secrecy.

11

43.     Over twenty Beauty Times articles are described in this Complaint and many, many more articles from 2000 to 2012 still need to be translated.

**Unidentified Associations**

44.     Unidentified Associations 1-5 are associations, websites and trade publications, presently unidentified, which have furthered and aided the enterprise and conspiracy alleged in this Complaint.  Before the close of discovery, leave will be sought to name and join these Associations as additional parties.

**Unidentified Wholesalers**

45.     Unidentified Wholesalers 1-50 are manufacturers, importers or wholesale distributors of beauty supplies, presently unidentified, which have furthered and aided the enterprise and conspiracy alleged in this Complaint. Before the close of discovery, leave will be sought to name and join these Wholesalers as additional parties.

**Unnamed Retailer Co-Conspirators**

46.     The enterprise, combination and conspiracy alleged in this Complaint includes thousands of small, family-owned Korean businesses, beauty supply stores and salons across the United States that sell human hair to stylists and end-user consumers.

47.     These Retailers are an integral part of the illegal enterprise, combination and conspiracy alleged herein, and many of the illegal activities

described in this Complaint -- including the fixing of retail prices and the group boycott of potential Wholesaler competitors -- could not be accomplished without the collective participation of the Retailers acting through their various trade associations.

48.     The actions of the Retailers have been sought out and encouraged by the Defendants and their members in this case and many of these actions operate against the interests of individual Retailers, but enhance and protect the collective power of the Wholesalers and Retailers together in furtherance of their shared enterprise.

49.     Because the violations and injuries alleged in this Complaint all arise from joint and coordinated activities, Defendants are each jointly and severally liable for the injuries caused by the entire conspiracy, including any actions attributable to the Retailers or other as yet unknown co-conspirators.

50.     Plaintiff reserves the right to (seek leave from the Court to) name one or more Retailers or other co-conspirators as defendants once the full extent of the Retailers' participation in the enterprise is more fully understood.

## COMMON ALLEGATIONS

### A.     *Korean Dominance of the U.S. Beauty Supply Industry*

51.     This action challenges one of the largest undiscovered conspiracies in United States history, affecting billions of dollars of interstate and foreign commerce per year.

52.     The conspirators in this case are a group of Korean and/or Korean-American owned businesses that collectively control the United States beauty supply industry through a well-organized network and hierarchy of national and regional trade associations, *inter alia*, Defendants.

53.     As explained on Black Owned Beauty Supply Association's website:

### How and Why Korean-Americans Dominate Ethnic Beauty Supply Store Ownership

July 5, 2013.  Koreans started coming to this country in large numbers [in the 1960s] due to political unrest in their country.  They pooled their finances (partly from funds provided by the U.S. for political refugee relocation funds) and, through networking among themselves, slowly took charge and control of several industries and trades.  Chief among these are fingernail, wig, commercial hair, and the beauty supply ethnic distribution businesses.  The main targeted area of operation into the professional beauty market by the Koreans was the [B]lack arena.  The Koreans learned early in the business (just as the majority manufacturers learned after a later entry) that this was where the greatest growth potential was. . . . What the research indicated was that although Afro Americans were only 11% of the population, they were consumers of more than 30% of the products and services.[3]

54.     A recent article in the *Atlanta Post*, also explains the ironic confluence of events that took place in the late 1960s that allowed the Koreans to take over:

---

[3] http://bobsa.org/how-and-why-korean-americans-dominate-ethnic-beauty-supply-store-ownership/

14

### Koreans own the Black Beauty Supply Market

March 26, 2013.  The wig business and the explosion of the wig business in South Korea in the 1960s is instrumental to understanding the Korean ownership of beauty supply stores.  According to the book "On My Own: Korean Businesses and Race Relations in America", the rise of the YH Trade wig manufacturing company was significant.  Founder Yung Ho Chang, conceived the idea of the company while working as the vice-director of Korean Trade Promotion Corporation in the U.S.  Between 1965 and 1978, his company exported $100 million worth of wigs.

The wig business was doing so well, especially amongst African-American consumers that the Korean Wig Merchants pushed to corner the market.  "In 1965, the Koran Wig Merchants joined together and convinced the Korean government to outlaw the export of raw hair," said Aron Ranen, a filmmaker who has documented the marginalization of African-American entrepreneurs in the hair care industry in the film "Black Hair."  "[This ban] made it so that one can only buy the pre-made wigs and extensions."  In other words, Korean hair could only be manufactured in Korea.  "Six months later, the United States government created a ban on any wig that contains hair from China," effectively putting South Korea in prime position to exploit the market.

The business structure helped set up many Korean entrepreneurs in the sale of wigs and over the past five decades, wig stores have evolved to become full fledged beauty supply stores where hair for weaves and extensions represent the top selling products.  Since then, it's been a chain reaction as one store begets another; family members and employees of one store owner duplicated the business.

*   *   *

Today, there are over 9,000 Korean-owned beauty supply stores serving a billion dollar market for Black hair.  Between, manufacturing, distributing and selling these hair care products, Korean entrepreneurs appear to control all major components . . . and these Korean owned distributors discriminate against Black store owners in order to maintain their monopoly in the market. (source:

http://madamenoire. com/104753/why-do-koreans-own- the-black-beauty-supply-business/).

## B.    *"Human Hair" Defined*

55.    One of the most profitable products imported and sold by the enterprise described in this Complaint is human hair, including products made from human hair.

56.    In the United States, human hair is primarily used by Black women to augment their natural hair styles.  Stylists and salons braid or sew wefts of human hair ("extensions") into customers' scalps using various methods ("weaves") and, while not as popular now as thirty years ago, some human hair is also made into wigs.

57.    Virtually all of the commercially available human hair in the United States originates from China, India, Korea or Indonesia.  Raw, unprocessed hair is cleaned, sorted and packaged in these countries before it is imported into the United States.

58.    Human hair is a natural product that is collected primarily from young women or religious pilgrims in China and India.

59.    Young women in Southeast Asia are recruited and paid large sums to grow their hair to lengths of 10 to 24 inches, or longer.  The human hair collected in this manner, from one donor all cut and oriented in the same direction, is highly desirable because the hair strands are more uniform in color and texture, because

the strands will process the same, and because the strands all retain the same natural appearance.

60.    Millions of pounds of human hair are also collected every year by religious temples.  These temples, primarily in India, are visited by thousands of religious pilgrims each year who sacrificially offer their hair to the temple in mass religious ceremonies.

61.    The temples and monks collect this hair and sell it in bulk to Chinese processors and manufacturers, where it is cleaned, processed and packaged for sale in the United States.

62.    It takes a long time for human hair to grow to the lengths that are needed for commercial processing and, due to its personal nature, there is a finite supply of genuine human hair available in the world at any given point in time.

63.    Because human hair is scarce, especially in the higher more-expensive grades, some unscrupulous manufacturers mix human hair with other fibers to mislead consumers.

64.    The most common human hair adjuncts are synthetic fibers and animal hair.

65.    Synthetic fibers are inexpensive to produce, but they do not hold color or styles like real hair and they are prone to breakage and burning or melting when heated.

66.     Animal fibers are also relatively inexpensive to produce and animal hair including horse, cattle and yak hair are all frequently used as adjuncts.

67.     Yak hair in particular is often used in hair products imported into the United States because the fibers so closely resemble the qualities of real human hair.

68.     As part of their investigation, Plaintiff's counsel sent seven samples of popular hair products to a reputable forensic lab for testing.  <u>All of the samples were packaged and labeled as containing "100% Human Hair</u>."

69.     While each sample included small amounts of real human hair, the testing revealed that five of the seven samples also contained yak hair from the species Bos grunniens.   The two remaining samples were augmented with synthetic fiber.

70.     Defendants and their members know these mislabeling practices are commonplace in the U.S. beauty supply industry, because: (a) retail beauty supply stores are literally overflowing with different kinds, types, styles, lengths, colors, etc. of supposedly "100% human hair," including more hair than could ever possibly be produced naturally; and (b) the wholesale (and retail) price of human hair in the United States is significantly below the cost of purchasing real human hair in Southeast Asia even in bulk.

71.     In fact, the practice of mislabeling human hair is so widespread that the Wholesalers have devised a secret grading and pricing system so products can be uniformly priced by members of the conspiracy; in the absence of this grading and price system, cheap synthetic hair and animal hair would erode the price levels of all "human hair" including the very high end and expensive products that, in fact, contain 100% human hair.

72.     "Grade A" hair, also called "remy" or "remi" hair in the trade, is exclusively comprised of human hair.  Wholesalers often misleadingly label this hair as "100% Brazilian, Peruvian, Japanese, Indian Temple or Malaysian hair," but the primary features of Grade A hair are its composition (real human hair) and the fact that it was collected from a single donor (remy), and therefore all the hairs are the same length, orientation and color.  Grade A hair always retails for more than $100 per weft, but comprises only a tiny portion of the human hair sold in the United States.

73.     Grade B hair, which is also typically labeled as 100% human hair, is hair that contains up to 50% of animal hair.  Grade B hair is sold in the retail market under numerous brand names for roughly $30 per weft.

74.     Grade C hair, which also is typically labeled as 100% human hair, is hair that contains more than 50% animal hair.  Grade C hair is sold in the retail

market under many of the same brand names as Grade A and Grade B hair, but at prices usually ranging from $10 to $15 per weft.

75.     And finally, Grade D hair, which also is referred to in the industry as "master mix", is comprised of at least 50% animal hair with the rest synthetic.

76.     Some unscrupulous Wholesalers and Retailers also label Grade D hair as 100% Human Hair, but most often these products are sold with descriptions like "human quality hair" at prices of around $5-$10 per weft.

77.     The Wholesalers and Retailers know that the vast majority of human hair being sold in the United States does not and cannot contain 100% human hair, but as part of their common enterprise and conspiracy, everyone continues to allow the public to be deceived.

78.     These industry labeling, grading and pricing practices have also been the subject of frequent discussions by the Wholesalers and Retailers, especially as they relate specific lawsuits, investigations or complaints brought on by angry customers.

79.     This massive fraud is nothing new.  Retailers have lamented the issue in Beauty Times and elsewhere for years, without avail:

### *We Cannot Postpone the Content Label for Human Hair*

March 5, 2009. At the present moment, because it even drew the interest of the judicial authorities regarding the issue of the content label of the human hair products that are being dealt by the beauty suppliers, it became a fire on the foot.  If this kind of situation is not

faced quickly and corrected as soon as possible, our circumstantial judgment is that it could lead into bigger problems.  In this case, from the level of the union of wholesaler, retailer, and the consumers, I contribute this writing.

There can be several reasons for the rise of skyrocketing price of human hair within the last few years, but the prime cause is the change of the life style of the original suppliers due the increase of their income; that we can call "the scarcity of raw material."

The hair product that our retail stores carry can be categorized into synthetic, human hair, and animal hair.  Of course, the synthetic products are already labeled; there is no reason to discuss them.

The problem lies in the label of the blended hair openly saying "100% human hair."  Recently NBSDA took samples of the portion of the products that are labeled "100% human hair" and requested testing from Princeton University.  What were the results?

Because NBSDA is astonished at the outrageous lies, there is a time that it sent the notice based on the data to the relevant companies for corrective action.  Of course because of the sense of community spirit within our Korean people, which consist of the majority people in this market, rather than announcing, they are embracing and earnestly hoping that this kind of fearful areas will be corrected, and is not openly announcing.  Soon NBSDA will sample the "100% human hair" and depend on the prominent Korean agency for content analysis.  This kind of method is for every one of us to survive.  The fraud label toward the consumers destroys the credibility in the business world and shortens the lifespan, and eventually it will lead ourselves into the way of destruction.

I don't want to consider and blame the principle that because of the "scarcity of the raw material," the price will go up, and if we supply with higher price, it will lead to a decline in sales.  Probably the decline in sales is the most fearful thing for the companies in which the prime subject is the source of profit.   And therefore, for a temporary solution, the pricey human hair was mixed with cheap synthetic and/or animal hair for a cost reduction and was supplied to those customers who are looking for inexpensive hair.  As the price of

human hair was raised, this kind of practice began to stand out, and because of the blend ratio of the human hair progressively lowered, it became the horrific present reality.

## C. The Wholesalers' Illegal Industry Framework

80.     During the formative years of the beauty supply industry from 1960 to 1990, the Wholesalers worked together with and through the AHIA to fix prices, allocate markets and create elaborate systems to run and manage their fledging enterprise. Some of these systems have become so commonplace in the industry that they are still in use today even though they encourage and promote illegal activity.

### i. Money Laundering

81.     Incredibly, the Wholesalers and Retailers in this industry transact business mainly in cash. The system, covering tens of thousands of transactions and millions of dollars per year, operates as follows:

82.     Wholesalers' sales representatives visit the stores of Retailers' in person and leave products on consignment for sale to the public.

83.     Retailers give the sales representative a post-dated check for the full amount of the purchase as collateral. These checks are drawn on each Retailer's individual checking accounts.

84.     As products are sold by the Retailers, the Retailers make weekly cash deposits into the Wholesalers' bank accounts using the bank's large network of

22

branches.  To facilitate these cash deposits, which typically range from $2,000 to $4,000 per Retailer per week, the Wholesalers provide Retailers with preprinted deposit slips containing the Wholesalers' account information.

85.    Once the consigned inventory is paid for in full, in cash, the Wholesalers mail a copy of the Retailer's check back to the Retailer stamped "void" and the cycle begins again.

86.    Once these relationships have been established with a Wholesaler, the Retailer may also begin ordering products by phone, which are shipped either through the U.S. Mail or through package delivery services like UPS or Federal Express.

87.    The clear and intended purpose of this system is to launder money and avoid paying taxes.  In fact, one recent article even warned that "several Koreans were arrested for splitting $10,000 and depositing it in several accounts."

88.    In 2011, several Wholesalers simultaneously sent "open letters" to the industry warning of the likelihood of an IRS crackdown:

### *The Wholesalers Consecutively Sent Letters to Control Cash Payment*

July 7, 2011. The wholesalers consecutively sent the document called "Guide to Cooperate Regarding the Payment Option" to advise the retailers to restrict or to prohibit the cash payment.  *Sun Taiyang* company sent the letter of request asking for cooperation, and the beauty supply company, *Shake N Go Company* and *Kiss* also already sent previously.

*Sun Tiayang* company, in the notice, asked for understanding from the retail stores by saying with apprehension, "Lately, because the city banks closely examine the cash flow even to the insignificant transactions in order to prevent the illegal financial flow, in case of the auditing of the account, there could come a situation that could cause inconvenience to the customers." *Sun Tiayang* company also informed about the unexpected accident, loss, and robbery that could happen due to carrying cash, along with the problem that could rise when possession is searched when one is trying to board in an airplane.

\*   \*   \*

At a glance, it seems like that this kind of action taken by the wholesalers has come about due to Internal Revenue Service's financial tracking that we pointed out in last June's edition.

The IRS has a standard from the ratio of the credit card sales, it estimates the sales of the whole store.  It is told that this standard is fragmentized according to the geographic area and type of the business.  For an example, if a beauty supply business in Area A had a credit card sales of $10,000 and if 50% standard is applied, then the whole sales amount is calculated to be $20,000.  And from this, if the amount is less, then the IRS assumes it to be an error and omission in tax.  In reality for an instance, recently a certain hair business was known to have received questionings several times from the IRS.

89.    The coordination and Wholesalers' support of these money laundering activities is also  explained in the following June 2012, Beauty Times article:

### *How Do the Hair Wholesale Companies Receive Payments*

1.    How much time is given to the retailers to pay?

   30-45 days: 3 companies
   30-60 days: 6 companies
   30-120 days: 1 company

When we asked the retailers about the actual practices, there were virtually no companies that demanded 30-45 days for the payment period.  I could understand the inconsistency of the answers given by the wholesale companies and retail companies with the following additional explanation that all ten wholesale companies said in unison, "Right now, the economic situation is not so good, so there are circumstances that the payment is made a little late.  In that case, we make adjustments through a conversation with each other."

When the amount is not so great, there are circumstances that C.O.D. (collect on delivery) is used to receive payment right away (7 companies).  In case of the first transaction, because there is no credit built up by the customer, the payment is made at the same time the delivery was made (6 companies).

There are cases when the salesman visit the store, the collection is made (check, money order, cash, etc.).

90.    Finally, these practices are described in the January 16, 2014 forfeiture complaint filed by the U.S. Department of Homeland Security against Shake-N-Go Fashion, Inc. and Model Model Hair Fashion, Inc.  That complaint (attached as Exhibit A hereto) sought $15,000,000 in asset seizures which Shake-N-Go and Model Model agreed to pay.  As detailed in that complaint, this was a relatively small forfeiture given that Shake-N-Go and Model Model's 2012 revenues exceeded $228.4 million and $84 million, respectively.

91.    Laundering money and helping others to launder money is illegal and constitutes a predicate act under the Racketeer Influenced and Corrupt Organizations Act.

### ii.    *Mail Fraud*

92.    As the previous articles and interviews with several local beauty supply stores confirm, the Wholesalers all use the U.S. Mail and other package delivery services to receive orders, ship products, collect payments (cash, COD's and money orders) and return Retailers' post-dated checks once the cash deposits have been made.

93.    Use of mail and package delivery services in connection with an illegal enterprise or with the intention of circumventing U.S. laws constitutes a predicate act under the Racketeer Influenced and Corrupt Organizations Act.

### iii.    *Tax Evasion*

94.    According to a recent article in Beauty Times, the underreporting of income and sales taxes by Retailers is rampant in this industry:

#### *Time to Do Sales Tax Loosely is Over*

June 2, 2011.  Recently the bill that was going to revise the IRS form 1099-MISC was cancelled, in which the small business owners including the beauty supply retailers have to report whenever they make materials purchases or use services over $600.00  This bill was aiming to raise the tax revenues in order to secure the finance for the health insurance; recently the cancellation of the bill was agreed in both houses of the congress, and President Obama finally signed; and there was a relief from the concern from so called "document crisis."

If we give example in the case of beauty supply regarding this issue, every time a retailer makes a purchase over $600.00 from the wholesale company, it has to go through the trouble of filing the form 1099-MSIC to report to IRS.

But the concern for this type of problem is not over. The action against the practice of having inaccurate tax return from being continued is being implemented starting this year. This is precisely the action that is taken so that the amount of the credit card sales used in the business is reported to the IRS through the credit card companies.

Until now, the credit card member stores, which is the retailer, directly reported credit card payments to the IRS, but according to this action that is being carried out from this year, the credit card companies have to report directly to the IRS regarding the transaction information. For an example, if Beauty Supply Store A received a credit card payment from a customer using VISA card, then it forces VISA credit card company to directly report to the IRS the total amount that was paid to the Beauty Supply Store A during the whole year.

Until now, there were some circumstances that the business decreased the amount of the profit from the credit card payment when it reported to the IRS, but eventually, it cannot be done that way in the future.

In the future the sales tax that our beauty supply retail business has to report will certainly increase. From the mandatory reporting of credit card payments, the accuracy of the sales estimation will become higher. When the IRS estimates the sales, it has the predetermined ratio of the credit card sales to the cash sales; and if the credit card sales amount is accurately reported, the IRS's fixed rate of cash sales also has to rise. Therefore, this means that for the retailers to report less than the actual sales will be difficult.

\* \* \*

Stores that are very different from other stores will become an IRS's target store and become an object of observation, and at a certain point in time it may receive a tax investigation.

95.     Korean businessmen interviewed by the Beauty Times always credit

the industry's success to the Koreans' decision to deal only with other Koreans.

However, this kind of secrecy and ethnocentricity in many respects has converted the industry into a criminal enterprise that operates like organized crime.

96.     In fact, because the industry is so secretive and wary of outsiders, Korean trade magazines often publish articles on accounting topics that are written in Korean by Korean Certified Public Accountants.  One such article noted, for example, that in Korea, a typical business expense means that "I take you out to a fancy dinner and you look out for me," which usually "involves a lot of fancy bottles of alcohol, golfing, fancy restaurants, and even perhaps paying for the entire family's vacation costs."

97.     Evading and conspiring with others to evade paying income and sales taxes is a criminal offence and constitutes a predicate act under the Racketeer Influenced and Corrupt Organizations Act.

### iv.   *Customs Fraud*

98.     According to conversations with U.S. Customs personnel, there are no special declaration or bonding requirements to import real human hair or body parts into the United States.

99.     The importation of animal hair, in any form or quantity, is quite a different matter due to potential threats to the U.S. cattle supply.

100.   For example, 42 C.F.R. § 71.54 prohibits any "animal products" including products containing animal "hide, hair, skull, teeth, bones or claws" from

28

being imported into the United States without a permit issued by the Center for Disease Control (CDC).  The regulation also requires the "importer" to "take measures to help ensure that the shipper complies with all applicable legal requirements concerning the packaging, labeling and shipment of infectious substances."

101.  9 C.F.R. § 95.7, governing the importation of "wool, hair, and bristles" also restricts the importation of materials that have not been inspected by an "inspection service determined by the Secretary of Agriculture to be adequate to assure that such materials" are not contaminated.  Shipments of animal hair that have not been inspected must be bonded, sealed and quarantined in the port of arrival until the shipment is reviewed by the staff of the Deputy Administrator of the Department of Veterinary Services.  9 C.F.R. § 95.8.

102.  According to copies of bills of lading obtained from public databases, the Wholesalers typically describe their shipments of products containing animal hair as anything but animal hair.  Actual descriptions include: "Printed Goods-Brochure/Posters"; "Notebook"; "Hair Goods (100% Synthetic Fiber)"; "Hair Goods"; "Human Hair Partial"; "100% Synthetic Hair Goods".

103.  Because many of these products, as confirmed by Plaintiff's laboratory tests, contain yak and animal hair, they should have been quarantined and claimed as such on the shipping manifests.

104.   Because no quick way exists to distinguish animal hair from human hair in a shipment, containers that were accurately described might have been impounded for months while the appropriate lab tests were performed.

105.   Knowingly evading U.S. importation and customs requirements is a criminal activity and constitutes a predicate act under the Racketeer Influenced and Corrupt Organizations Act.

### v.   *Product Mislabeling*

106.   Knowingly mislabeling products in the United States violates the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and constitutes a predicate act under the Racketeer Influenced and Corrupt Organizations Act.

107.   As detailed in numerous Beauty Times articles, including those discussed above, the industry-wide mislabeling of human hair has been an ongoing concern of Retailers for at least the last decade:

> **Fraud Human Hair Product, Receiving Accusation from the State Public Prosecutor's Office, The Matter that Must Come has Come; Anxiety Inside, "If We Make the Opportunity From Preparing the Plan to React"**
>
> August 27, 2008. Retail Store A in North Carolina region recently received a letter from the Consumer Products Division under the State Public Prosecutor's Office. The content of the letter was asking for the explanation for the complaint that one of the customers filed to the Consumer Protection saying that the human hair product that was purchased at $9.99 is a fraud product made of synthetic material.
>
> The retail store owner L suddenly got scared, and immediately contacted the wholesale supply company M in New York and the

company C in Atlanta, requesting for the plans to defend.  For now, the owner of the store is in the process of preparing the answer in his own way, and it is somewhat like this:

"In our store, we have prepared the products in various price ranges according to the ratio of the human hair for the various levels of the customers.  We have placed the 100% human hair products behind the cash register counter and sell them, and for the customers who want the lower priced product, we have placed the product that the human hair is partly blended on the display floor, so that it will be easy for the customers to grab.  As one of the customs, if it has even a little bit of human hair, it was sold as a human hair product; and besides this case, there was not even one customer who has made the issue."

\* \* \*

[B]ecause this type of issue is an example not only for a part of the wholesale business, but is a custom that is rooted deeply in our industry, before we suffer further from this kind of issue in the future, he will strongly demand other wholesale business to rectify. . . . [W]e have to change all of the package in case there is a demand of accurate labels.

108.  The illegal activities and regulatory violations cited above were knowingly employed and facilitated by Defendants and their co-conspirators (as evidenced by the supporting articles), and each of these acts constitutes a discrete predicate act under the Racketeer Influenced and Corrupt Organizations Act.

## D.   *Maturation of the Retail Beauty Supply Industry*

109.  By 2005, markets like Atlanta and St. Louis were starting to become saturated with beauty supply stores.  In response to this increasingly tumultuous competitive landscape, the NBSDA split into two organizations in 2007; the NBSDA, which represents many of the east and west coast Retailers, and the

ABSA, which represents many of the Retailers in the more price-sensitive Midwest.

110.   Like the Wholesalers, the Retailers, through the NBSDA and ABSA, began to collaborate to protect "their industry."   The Georgia chapter of the NBSDA, for example, adopted the following territorial "rules" which were published in Beauty Times:

### *The Domain Protection of a Member*

The association rules, in order to protect the domain of a member of the association, according to the Georgia Beauty Supply Association Rule, are as following:

Article 6: Protection of a Member

1.      This association, in principle, protects the domain of the members.

1)      ***Within the boundary of 1 mile zone of the location where the members operate their businesses, no one can approach and do business***.

2)      Whenever anyone violates the item 1), then this association, not only apply sanctions in order to help the harmed member, but also help the harmed member.

111.   Official NBSDA "notices" published in Korean-language newspapers also show that these *per se* unlawful territorial rules were routinely enforced:

### Association News

### Notice of Excommunication of a Georgia Association Member, the Report of the Result of the Council, and News Release

## NOTICE

July 8, 2012. We announced that because Georgia Beauty Association, in order to protect the rights and benefits of its members, has a 1 Mile Rule in its association rule article 6 item no. 1, in which it restricts a new store from opening within the 1 mile zone of an existing store; and the newly opened store in Duluth this time, *Beauty & Beauty* (representative: Sung Ok Choi) is within 1 mile from the existing store; and because it is causing a great influence to the existing store; based on the rule article 6, item no. 1, through a decision made by its council, Georgia Beauty association decided to stop the right that is given to J.J. Beauty (representative: Sung Ok Choi) to be a member, and at same time, to excommunicate.

Also, in the future, if this kind of instance occurs, Georgia Beauty Association is planning to take a decisive action and actively protect the existing businesses, and to request the cooperation from the wholesalers, and to continually announce through the association publications and website.

112. A follow-up article in the Joong Ahng Newspaper, also reported that:

### The Report of the Agenda Resulted from Georgia Beauty Supply Association Temporary Council Meeting

[On July 8, 2012, the Georgia chapter of the NBSDA] made a resolution that in the future in case of senselessly opening near the members occurs, we will strongly take a decisive action, and on the other hand we will request a cooperation from the wholesalers.

Even though we diligently operate small stores in recession time when everyone has hard time, we wish that we restrain ourselves from the action that will dry the blood senselessly among Koreans and compete with each other, and we hope that everyone will keep the ethic in the trade.

113. Additionally, according to published news reports, the NBSDA adopted pricing rules prohibiting its members from discounting the retail sales

price of human hair.  If a Retailer decides to put its products "on sale" or market them online, it cannot price them below 150% of the wholesale cost, so that competing Retailers can still earn a reasonable (at least 50%) profit.

114.   These kinds of coordinated price fixing and market allocation agreements are illegal *per se*.

**E.   Defendants' Concerted Efforts to Restore "Order" in the Beauty Supply Industry**

115.   Up to the recession of 2008, the U.S. beauty supply industry operated fairly cooperatively.  The Wholesalers shared information and "best practices" with each other and they collaborated as a group to protect the Korean's ownership of the market.  The Retailers also collaborated, at least regionally, to ensure "market order" and to protect against local price erosions.

116.   During this period, "It would not be unreasonable to emphasize that the relationship between wholesalers and retailers is like a symbiotic relationship of "flowers and butterflies," and trusting and relaying harmonious relationship of 'Soonhee and Chulsoo,' because it is a relationship of a precious partner."[4]  Mar. 5, 2009 Beauty Times article *We Cannot Postpone the Content Label For Human Hair*.

---

[4] The Korean story of Soonhee and Chulsoo is similar to the American story of "Jack and Jill."

34

117.   However, between 2008 and 2010, the relationship between the Wholesalers and Retailers changed.  They realized that if they did not begin working together -- to the exclusion of everyone else -- their happy partnership was going to end.

118.   As detailed below, increased wholesale and retail competition was a factor in the decision to unite, but the major forces that drove this change were: (a) the world-wide recession, (b) a world-wide shortage of human hair, and (3) a severe labor shortage in China (due in part to China's growth and its preparation for the 2014 Winter Olympics).  As a result of these forces, the wholesale price of human hair began to skyrocket, which led to panic buying.

119.   Bulk prices for 10" Chinese remy hair, for example, rose from $150 per kilo in May, June and July of 2011, to $250 per kilo in August and September, to an astounding $300 per kilo in October, November and December of 2011.  This is a 100% increase at a time when most U.S. consumers were unwilling to pay for luxuries like beauty supplies.

120.   By mid 2012, prices had risen even higher, topping out at close to $400 for a kilo of Chinese remy hair.

121.   Panic buying and swelling inventory levels eventually forced the Wholesalers to begin dumping millions of dollars of inventory into the United

States, which fueled competition and began to erode the pricing structure the industry had carefully created.

122. By 2012, competitive and recessionary pressures had become so strong, that NBSDA President Ji Yong Sohn called for renewed cooperation by all Korean Wholesalers and Retailers:

> Due to the recession that was caused by the increase of the human hair prices which blew in since last year, we all wholesalers and retailers of beauty business certainly went through hard times. The increase of prices and the increase of labor costs caused us to have a difficult time; and most important issue is that because of sudden increase of the price from the human hair production companies in China, it was a year that we retail business industry suffered a very big blow. . . . Now, this business industry needs to put the heads together and adjust this industry by correct the features that are not correct, and change the things that are wrong.

**Increase of Price after the Negotiation between Wholesaler and Retailer**

> Meanwhile, the result of collecting the opinions from many wholesale businesses and retailers regarding the increase of the human hair this time, there were many opinions saying that the cause of the sudden rise of the price of the human hair is the marketing plan that includes panic buying competition among few hair wholesale businesses.

> Certainly, each wholesale business knows better than anyone else about the situation in China regarding the depletion of the human hair becoming more and more reality; and because of this also is very important issue in all of our industry, everyone in the industry had a special interests.

> But regarding this important pending issue, few wholesale store, not considering the difficulty of the retail stores, announced that it is assumed that because of the marketing, the prices is increased and the human hair is going to become high quality. In actuality, there is little increase in the high quality market and the product that is actually

being supplied are those products that are worse than previously. In the present situation, I think that no one can say that the market is going to the right direction. Also we retailer business, as much as the wholesalers have created organization called the AHIA, only sold the diligently the products and believed that this kind of important issue will be discussed sufficiently together with the factory side by AHIA representing us businesses for us regarding the future of industry. Also meanwhile, as much as the wholesalers and retailers together lead this by having the sense of companionship, I think through the judgment assuming that the wholesale business industry also would not think too much differently from he retail industry's perspective and handle it wisely.

Regardless of this kind of our desire, few wholesale businesses were panic buying the huge quantity of human hair. Also when the product that they acquired through panic buying did not sell smoothly, announcing through the news that the price of the human hair will be increasing, they enticed the retailers to buy beyond their needs and caused a phenomenon to arise where the retailers were scrambling for panic buying. Because of this, the stocks that the retailers were carrying were far more than what they needed; and by the time they were going to sell the stock, each company introduced the low priced products. And because of that, the retailers could not bring out the products to the store that they had purchased previously, and the market became more unstable.

Furthermore, from this condition, since low priced hair product had been introduced, our present situation is that we do the business not honorable toward the consumers. It is impossible for us to expect to see the vitalization of the market economy. The retailers have the stock beyond their need, and the wholesalers are raising prices, and yet the cheaper products are continually increasing.

The amount that the retailers have at the present moment must be exhausted. Only then do I expect this present frozen economy will be revitalized even a little bit. I suspect that one of the reasons for the increase of the human hair this time is from the excessive competition due to the wholesale businesses' panic buying. In the future, I urge the wholesalers and retailers to make an agreement, and seek a plan to increase within a reasonable price; and I wish that each representative

from the wholesale businesses will explain enough our situation to the public corporation in China regarding the intention of the retailers.

## Establishment of Hair Label

As I said earlier, our industry is conducting our business using an improper method.  We are conducting our business sin a way that we "close our eyes and say meow," by selling hair that is not 100% human hair and say that it is "human hair" or "fine human hair," etc.  I clearly remember that in an interview asking to believe that the AHIA wholesale businesses are not selling the product that is blended with animal hair or synthetic hair.  Is it true?  The human hair market is in the process of becoming high in quality, and so prepare yourself with high quality.  Whether or not it is, we cannot help but to doubt.  I urge strongly to prepare a standard and enforce using the label soon.

## Prohibition of Product Sales in Beauty Salons

Currently, in many locations, it is detected that some wholesalers are selling to the beauty salons all kinds of products including the wigs changing only the packaging.  Because this creates 3 way competition among the retailers and the beauty salon, it brings about a chaotic market; and for the retailers, it is becoming a big damage in sales.  I strongly urge that this kind of matter, which creates disorder between the wholesalers and retailers, should never happen.  It is a time that we need the wisdom, courage, and resourcefulness, to prepare for the future of this market before the storm hits by cooperating with each other in this industry which was cultivated by our sweat and passion.  At this moment, when Chinese, who has great capital strength, is definitely predicted to be a challenge; if we cannot unite and go to in a right direction, then the time will certainly come when we will fight with them in the market competition in an condition that is much worse than the present situation that is steadily downhill.  But if were prepare a standard, and if everyone keeps that standard, I think that this business industry will not break down that easily.

Beginning of last March, about 30 chairmen from each district under the NBSDA, in order to prepare for a countermeasure for our businesses, have decided to request cooperation that is written below,

which is the retailers' desires in order to resolve and overcome the difficulties that wholesalers and retailers are having.

1.    Publicize periodically through articles about indisputability of the increase of human hair in African-American magazines or newspapers, and produce and send the written guide that can be placed in the retailers' store.

2.    Form the standard hair quality label (content, weight, and safety instruction).

3.    Establish fair trade.  (Encourage to mark the consumers' price). Restrictive plan regarding the stores that sell the product under the fixed price.

4.    Because recent inflation rate of the human hair is too difficult to deal with, regulation on the inflation rate or regulate the inflation rate step-by-step.

5.    Development of new product or the reservation of the supply until the possible stable time of the market.

We wish for the active cooperation regarding the items that we demand above. . . .

123.   As detailed below, the industry had reached a state of crisis where Wholesalers and Retailers could no longer unilaterally stave off competition or the erosion of prices for human hair by themselves.  To protect their mutual business interests and enterprise, Wholesalers and Retailers started to conspire with each other through their respective trade associations (Defendants) to protect the industry they had created.

124.   The first known meeting of Wholesalers and Retailers occurred in September 2008, as reported by the Beauty Times:

*National Association Holding An Invitation Conference with Hair Industry*

September 12, 2008. On September 3rd, while the national president Ji Yong Sohn was present, Northeastern Broad Council [of the NBSDA] (President Byong Sam Sung) held a meeting at Ulmido restaurant located in Palisades Park, NJ inviting the presidents and practically responsible people of the Hair Industry (AHIA) who reside in the vicinity of New York and New Jersey area.

The companies that were present were Shake N Go, Sun Taiyang, Hair Zone, Beauty Plus, and New Jigu Co. The content that was discussed on this day was fraud human hair, unfair trade, supplying to other ethnic groups, establishment of content label, etc.; many problematic issues were discussed, and making this meeting as a starting point, they decided to try to meet regularly.

**F.    The Wholesalers' Group Boycott of a Threat to the Retailers**

125. The first example of the Wholesalers' and Retailers' mutual collaboration is the 2009 group boycott of the startup beauty supply chain, Planet Hair & Wigs. Planet Hair was unique because it was owned by an Arab businessman who had already achieved success with a series of beauty supply stores in Atlanta, and because Planet Hair had already signed leases to open six beauty supply "outlets" inside Walmart 24-hour superstores in Atlanta.

126.  In the four-count antitrust complaint that Planet Hair later filed in the United States District Court for the Southern District of Florida, Case No. 09-cv-23837, Planet Hair accused suppliers Beauty Elements Corporation and Beauty Plus Trading of joining a group boycott that had been orchestrated by the Defendants in this case, including local leaders of NBSDA and ABSA.

127.   According to Planet Hair's complaint, Beauty Elements and Beauty Plus both had initially agreed to supply Planet Hair with products to sell in the outlets, but then succumbed to pressure from the local beauty supply community and refused to deal with Planet Hair:

> Planet Hair representatives were told that the "Korean's will not like this [the Planet Hair Store Concept]"; "This [the retail sale of hair products] is a Korean thing," "it is dangerous to talk to you -- the Koreans are upset" and other similar statements.

*   *   *

> Several other suppliers declined to supply Planet Hair with product and declined to open accounts as part of an organized boycott.

128.   The Planet Hair lawsuit settled in March 2010 -- 3 months after the complaint was filed -- for an undisclosed amount, but the Planet Hair outlets never opened.

129.   The following Beauty Times article excerpts explain Defendants' concerns and victory over Planet Hair:

### *Arab Franchise Selling Hair in Walmart*

*   *   *

October 22, 2009. [T]he beauty supply industry in Atlanta is tightly tense.  On top of the recession and exhaustion due to overheated internal situation, it is a situation where one falls, another one falls on top.  If one considers the consumers' traffic in the Walmart, the beauty shop here might have a big destructive power toward the existing industry.  Especially, the thing that the industry is paying attention is the concern for the disturbance of the order of prices.  The Chairman of the Georgia Association, Hyun Ho Hong, said, "Because this franchise not only is entering into Atlanta area but geared toward

41

the whole nation, we will leave our affiliation and planning to take cooperation from the NBSDA.

### PHW Filing a Lawsuit Against Korean
### Merchants for Violation of Antitrust Laws

\*   \*   \*

January 8, 2010.  The federal anti-trust act section 1 prohibits monopolies and contracts, organizations, and joint conspiracies that restrain deals and business transactions; and section 2 defines as a felony to all those who practice joint conspiracy in order to monopolize or try to monopolize the part of the United States economy.  Not only that, according to the equal rights law, it is ordered that everyone in the United States, regardless of race, has equal rights "just as much as the white people enjoy" to make and break the contract, and legally practice the content of the contract.

### Planet Hair & Wigs Company in Atlanta Closed At Walmart

\*   \*   \*

October 3, 2010. A person affiliated with Walmart [stated] "the store that has been closed enthusiastically presented the business by such as carrying the specialty items that were not carried by Walmart."

Entrance of the Planet Hair & Wigs into Walmart caused a great sense of pressure in the Korean beauty supply businesses.  Mo Park, a Korean man who is operating a beauty supply store in Lawrenceville, said, "After the beauty supply store entered into the Walmart in Lilburn last year, I was concerned if I will lose my customers to the Planet Hair & Wigs, which will compete the price.  And "Fortunately, because that business is closed, it is a "release of a big anxiety situation."

130.  Only through mutual collaboration and boycott with the Wholesalers could the Retailers have achieved this complete competitive victory over Planet Hair.

### G.      The Retailers' Group Boycott of a Threat to the Wholesalers

131.   In 2011, the industry faced a similar threat from the Chinese.  As was

reported in Beauty Times:

### The Reasons to Prohibit Direct Entrance
### of the Chinese Factories From Hair Market

November 4, 2011. Recently the hair industry is trembling.  It is
because there is a rumor that the huge scale Chinese hair production
company will do away with the wholesale import businesses and is
going to enter into the U.S. market and directly deal with the retail
businesses.    The wholesale import businesses are especially
responding sensitively and becoming tense.

* * *

[A]nd if the direct sale by the production company becomes the
reality, it will bring in the enormous wave into our entire hair
industry.  What will be that wave?  If I talk about the conclusion first,
it is the general opinion of the experts that there is a possibility of the
collapse of the entire hair industry.  If you ask me what are the three
biggest reasons, they are the following:

First of all, having the competition of low prices is a game that all
three parties of production, wholesaler, and retailer are to become
losers.  It is necessary to remember that there was a time that the  hair
industry escaped a crisis of turmoil by branding of the wholesale
import companies.  Direct entry of the production companies will
again stir up the competition in prices, and eventually it will cause the
retail market to collapse, because there won't be any products left in
which the retailers can make a profit.

Secondly, the direct entry of the production companies will force the
middle wholesale importers into crisis, and constrict the ability to
develop the product by the wholesale businesses who was leading the
hair fashion.  Also, the power of the wholesale companies, who has
been creating [different brands] to meet the demand of the customers
through the new products and the hair shows, will be lost.  As the

result, it will lead into loss for the production [companies] and the retailers.

Thirdly, due the control of the production company in the market, the power of the retail industry will be rapidly reduced, because our retail industry is different from Walmart.  As a chainstore which purchases directly from the production companies and sells, Walmart has the strong power to control the production company; but individual stores in small scale like us don't have the power to stop the control of the production companies.

Throughout the years, regardless of the opinion of some people, Korean immigrants have cultivated and advanced the beauty supply market through much effort and sacrifice. With the foundation of that effort and sacrifice, there was a mutual assistance within the ethnic group where the wholesale businesses and retail businesses lead and support each other with only reason of being Korean.  Even being under the struggle with severe financial problems, the wholesale side will supply the product under the credit for three to six months, and if possible, they put every effort trying to protect the retailers market. The retail industry side was similar also.  Even under the inadequate conditions fighting with crime, the retailers listened to the wholesale companies, continually purchased the products and sold them.   I believe that this kind of mutual care should be maintained continually. This kind of mutual care is certainly the driving force to maintain and advance beauty supply market where our blood and sweat has been penetrated.

*   *   *

Here are the reasons why we must strongly block the direct entry of the production companies.  Why do we have to start a game of fools where everyone together will become loser.

132.   Immediately following this call for an industry boycott of Chinese producers, the South Carolina chapter of the NBSDA publicly announced its intention to support the boycott:

***SC U.S. Retailers' Association Determined Not to Purchase the Products from the Chinese Production Company that is Entering into Wholesales***

November 3, 2011.  SC U.S. Retailers Association (President Yoon Shik Choi) held a regular meeting in August at Chin Chin Restaurant reporting financial status and preparing a resolution regarding the entrance of the Chinese production companies into wholesales.

Insisting that if the Chinese production companies enter into wholesales, eventually they will enter into retail industry; in the realm of the association, SC U.S. Retailers Association made a resolution not to deal with those companies.  In addition to that, the association requested the Korean wholesales industry to develop and supply products that have the same quality and price with the hair that is sold by those companies.

133.   Three months later, in January 2012, the Chinese producer of products sold under the brand name Rebecca® reserved a space at the Beauty Times' Las Vegas Beauty Expo to announce the launch of its products in the United States.  In unison, the Korean Retailers and Wholesalers in attendance boycotted that event:

**What Happened at the Beauty Expo?**

**Exactly what took a place in the show room in order to . . .**

January 2012.  Since the morning of January 9th when it first opened the show, there was a strange atmosphere in the showroom of the Leo Hotel where the Beauty Expo was being held.  Shin Ah Sah divided the booth into two parts, and Shin Ah Sah and newly created affiliated company Long Jam.  And when they displayed the products from a brand called Remy Couture, which is the Rebecca company's direct brand, on the wall of the Long Jam's side and advertised, few Korean businesses caught that and started to get agitated.  This product is the product that also caused by problem by their business method by comparing with the products of M company's Remy Hair, which uses Rebecca's production factory, and tell that their own direct brand, which is their own production, is better.

45

After that, little after 3 p.m., a disaster started where five of the Korean businesses blocked off their own booth, and all of their employees evacuated from the showroom.  The security guards that were working in the showroom started to guard the empty booths, and the people who didn't quite know the reason started to go here and there as a crowd trying to understand the situation.  From this kind of situation, Shin Ah Sah told other businesses that they are starting to exert an irrational pressure, and started to pass out the informative literatures that they had prepared.  But the dissuasion from the hosting party not to pass out the literature, they started to pass out the literature outside of the showroom.

Some of the people who are affiliated to the businesses who were observing this situation said that they brought the direct brand from the production factories and advertising it proudly in the showroom where the Korean people created and raised with much effort.  And it seems like that there is a hidden, impure motive in that as if they themselves are the ones who are being persecuted, making the affair big, and creating a loud issue, and advertising their own product.  This is not a matter that we can ignore, and in order to prevent a similar situation in the future, we need to take a strong action.

### Why did they evacuate in the middle of the show?

At first, I asked the businesses who withdrew from the show even before the show was over.  Exactly what took place in the show room?  For this question, a board member of a business that was involved, said, "This circumstances became an issue because Shin Ah Sah brought the direct product that is the brand of the manufacturing factory into the showroom.  This is an act that is below the common sense in which the manufacturing factory betrayed the company who gave an order, and was willing to compete in the same market.  Because it is no different from a wholesale store opening a direct retail store right next to a retail store that sold its own product for it, it is an act that destroys the circulation order.  Not only that, it is a serious matter in that we can think that this is a manufacturing company's so-called tasting strategy before entering into U.S.' beauty industry.  In addition to that, we expressed our strong will to protect

the beauty industry which is being lead by the Korean people by the image of evacuation from the showroom."

### Didn't he know that they are entering the show?

He continually said, "Actually, starting from the fifteen days before the show opened, I heard the news that the product of the direct brand of Rebecca company might participate in the Beauty Expo, and I made inquiries to the host.  But the host of Beauty Expo definitely promised to us that there is no possibility that the manufacturing factory's brand will be coming into the show.  Hereupon receiving the assurance, we participated in the show.  But, when I went into the showroom on January 8th in order to install the show booth, Shin Ah Sah made Long Jam booth and was displaying the direct brand of the Rebecca company, Remy Couture.  We went to the host and asked what is going on, and the host staid we are looking into it.  Please wait a little; we will evacuate the product that is a problem and promised once again."

### Deciding to evacuate from the showroom.

He said, "On January 9th, even on the day of the show, Shin Ah Sah did not take down the troublesome product.  Therefore, according t the direction that we made from the emergency meeting which continued from the day before, our company decided to evacuate from the showroom in order to express our will not to overlook at the conduct, in which the product of the manufacturing factory direct product trying to enter into the U.S. market through the showroom."

### Why didn't they evacuate in the afternoon during the show and not before the opening of the show?

"Actually, we were going to evacuate right away, when we saw the manufacturing factory's direct brand was installing in the booth, but because we could not give the sense of disappointment to the customers who have come from far region, we tried to postpone the timing as late as possible.  The reason that our company took this kind of action is to guard the beauty industry that the Korean people have built.  If we  neglect the response in the beginning, in first step, the wholesale business will collapse, and they will become coveting the

retail business.  Actually, it is hard for the retail business to check on the manufacturing company; the wholesale business must take action with a barefoot."

### It is a clarification of a strong will toward the conduct that is coveting the Korean beauty industry

Along with this, a representative from other wholesale business express his feeling of resentment, "What happened in the showroom on January 9th is certainly a resentment.  But, it is not because we deceived or carried out the evacuation because we took the business owners lightly.  In order to participate in the show like this, our company has to pay about few hundred thousand dollars for the expense.  We need to buy and decorate the booth, and there are expense to carry out special events and hotel expenses for the employees.  Even this, it doesn't mean that the new account opens at the show.  Literally, in order greet the customers and business owners who came express my intention of thankfulness, I see, but it is certainly too bad."

He strongly said, "If I had another reason to enter the show, I had a goal that by fully participating in a show that was hosted by a Korean person, maintain and advance the show, and express the statute of the Korean people.  Even then, this event is very resentful.  I wish that we could clearly see the conduct of manufacturing factory vigilantly await and coveting our market. And also in the future, I would not be present in the show that the manufacturing factory's direct company is participating.

### Telephone interview with Ms. Ann Park, Beauty Expo host

On the one hand, the host side that hosted this beauty expo shows the appearance of discomfiture from this sudden unpleasant incident. hereby I tried to call Ms. Ann Park, who planned and hosted this show.  With difficulty, at the place where the telephone as connected, she started to speak, "I am sorry that we showed an unpleasant incident that we didn't intend."  She said and expressed, "Actually, few months before we prepared for the show, the people from the manufacturing factory, through telephone and email, expressed their

desire to participate in the Beauty Expo. But regardless of their persistent desire to participate, we denied.

Regarding the Shin Ah Sah which became an issue, Ms. Ann Park expressed their position, "Shin Ah Sah was not a company that participated for the first time and is a company that had participated few times; and I understood that they will certainly bring their own product line and participate. But about 15 day prior to the starting of the show, I know that they are not only bringing their own product, but also the product of the Rebecca company; and I contact them several tens of times and restrained them and convinced them and dissuaded them. But because of the contract issue, we could not forcefully take down their product or evict them.

\*    \*    \*

Each response of the beauty supply business owners are being in disagreement President C, who is operating a beauty supply in California, who went around the showroom said, "Frankly, I don't know exactly what is what, but I am angry.  Although there must be every reason, but I don't understand about this disrespectful attitude toward the guests.  Frankly, as I operated the beauty supply and received a lot of mistreatments from the large companies, and even in the showroom I see this kind of incidents: there is not much feeling for the large companies.  President K, another one who said that he as from New York, expressed his thought saying, "From what I heard this that this was done in order to prevent the entry of the manufacturing factory; I understand that feeling.  if we look at it from some way, this seems like a "noise marketing method" of Shin Ah Sah, by creating the issue and making an incident in order to sell their product.  Having this kind of background in mind, the Korean business owners must respond and make a discernment."

### I asked Shin Ah Sah regarding their perspective on the display of the manufacturing factory's direct brand

Actually, we didn't think that this issue will expand like this.  The brand that we brought in this show Remy Couture is a hair product that is being sold in Europe and Africa region and was manufactured by Rebecca company. Because of the product was so good, the greed sprouted.  With my individual thought, I only wanted to quickly

introduce the new product to the guests who came to the Beauty Expo. Therefore, omitting the time and the process of remaking the package of the product or newly design, we brought as they were made by Rebecca company.

Then, starting a few days before Beauty Expo started, we heard that a portion of the businesses oppose Shin Ah Sah's brining out of the direct brand.  We heard this statement, we requested the host many times our desire to resolve with the company who brought out the issue by meeting them and through the conversation, but there was no answer.  and the host did not connect us with other companies. Frankly, it seemed unfair.  So we passed out about 300 printed literatures in the showroom and outside of the showroom expressing our position.

### What kind of company is Rebecca company which is an issue. . .

According to Chinese press medium Henan Jo Bo, Rebecca hair product company (Henan Rebecca Hair Products, under Rebecca company) is multinational hair product manufacturing company and listed company that is composed of three foreign subsidiary companies and joint-venture company.  Along with this, Rebecca company has a characteristic of labor intensive hair industry and has about 12,000 employees, and at one time it hired the prisoners from forced labor camp and provoked a controversy.  For an example, if you search "Henan sung Rebecca wig factory" on the internet, we can see a lot of writings reporting the experience that were directly experienced by the trainees from Pa Moon Palace in the forced labor camp.  According to a participant who were present at the recent Chinese hair manufacturing company meeting, the representative of this meeting president Jung indicated his will by saying, "The Jewish people earned money in U.S. with the wigs, and the Koreans took over and earning big money with hair and wigs.  Now, it seems like a time for us Chinese to inherit that spot."  This is an example that we can see the intention of the Chinese manufacturing companies.

### The association is also seriously looking at this incident

After the closing of the show, the national president of NBSDA, Bu Ho Chu, quickly formed retail business economic force reinforcement

special committee, and collecting the opinions from each and every level because of a judgment that there is a threat to the foundation of U.S. beauty industry from the changing movement of the distribution structure among production, wholesaler, and retailer.  The Chairman Hye Soo Oo, the person who the responsibility of this response organization, requested, "Before the definite truth will be revealed, please refrain from any kind of your action, you business owners."

### The reason that we need to secure a door

Not too long ago, Panda Restaurant Group (under Panda), the group that operates the biggest Chinese fast food chain in the U.S., Panda Express, announced to enter into the dry cleaning business, and cause the tension in Korean and other dry cleaning industry.  Panda, after the announcement, opened the 1st store in the suburb of Las Vegas, City of Henderson; and following that, beginning of this year, it is planning to open at least 5 stores.

This is bringing up a concern that if Panda, which had $1.4 billion in sales last year operating 1,400 restaurants, starts to place full-fledged franchise with its strong financial power, it will be entering as a strong competitor for the Korean dry cleaning industry.

The fact like this is not a story of other people now.  Many people are looking at the strong action taken against the entrance of the manufacturing company by the Korean companies is not simply a fight in order to secure their own rice bowl.  We can interpret that this is a prevention to block the main cause in advance for the manufacturing company to come into U.S. and -- the beauty industry that Korean people built up.

134.   As the previous in-depth review of the issue explains, the potential intrusion of Shin Ah Sah and Rebecca into the U.S. market was a major concern for Wholesalers and Retailers alike.   However, by February 2012, Shin Ah Sah and Henen Rebecca Hair Products, Inc., had issued a formal notice of

unconditional surrender. That letter, which was specifically addressed to the NBSDA, read as follows (emphasis added):

> To:   National Beauty Supply Dealers Association
>
>         Attention: Mr. Zhou
>
> Well received the mail dated Jan. 16, 2012.
>
> We really appreciate your continuous effort in the past thirty years to the develop of hair products industry in the U.S.A., which contributed to the current fine situation of hair products industry in this area.
>
> We deeply wish you may come to visit Rebecca and instruct us; and then, we will be able to come together to discuss the glorious future.
>
> When sincerely make the following statements:
>
> 1.     ***Rebecca has not set up an wholesale company in the U.S.A.***, or holding shares of any other wholesale companies.
>
> 2.     ***Rebecca has not and will never set up retail stores or involve in the retail business in the U.S.A***.
>
> Sincerely wish hair products industry a prosperous future.
>
> Hope you all enjoy a healthy and happy life in the New Year.
>
>                         Hennen Rebecca Hair Products, Inc.
>                         Youquan Zhen (President)

(A copy of this letter is attached as Exhibit B).

135.  Plainly, the Retailers' collective, outspoken boycott of Rebecca's products had worked.  More importantly, only through mutual collaboration and

boycott with the Retailers could the Wholesalers have achieved this competitive victory:

### *Crippling Crisis: An Opportunity to Prevent the Production Company from Advancing Directly to the United States Market*

### "Sorry that (we) couldn't stop (them) before."

February, 22, 2012. Beauty Times had a question and answer time with *Beauty Expo USA* company representative Gye Song Lee in order to explain to the readers and the participants of the expo trade show regarding this crisis of closing of medium and large size exhibitors in *Beauty Expo USA 2012* which was held in Las Vegas.

**Chief Director Soon Chul Kwon:**  First of all, please tell us the details of this accident which occurred in this beauty expo.

**Representative Gye Song Lee:**  Because there were many people who were wondering, I had a chance to explain in the seminar (about 200 people present) on the last day of the show.  If I summarize, it is as following.

"Thank you for staying until the end.  And (I) am sorry.  (I) will reveal the things that (you) are wondering.  (I) received a request verbally from the major businesses who acquired the show information directly from the production company that there would not be an incident that the Chinese manufacturing brand would not be caught.  The day that I received the request was 15 days before the opening of the show.  I tried my best so those products won't be caught, but it was impossible.  The opponent which is the relevant business brought out about his/her (their) rights and the problem regarding the violation of the agreement.  So therefore we faced this kind of crisis.  Most of all, (I) am sorry to you.  But if (we) take a wide view of (this event), I evaluate (this event) provided a chance to have a turning point in our industry.  It is a disaster if the production company enters directly to United States' market.  In order to stop this kind of disaster, the crisis that had never happened in the past happened.  Some businesses, by closing down their own booth during the show, expressed their strong stance regarding the production companies' direct entry to the U.S. market.  From that kind of

perspective, let's all think well (of this crisis).  And let's join that movement.  Thank (you) for patiently participating to the end of the show."

As (I) spoke like this, the attendees gave a thundering applause.  And every schedule of this show was ended as it was planned with my greeting saying that I will do my best for the continual progress of the beauty expo.

**Director Kwon:**  (I) understand that (you) have a intention to resolve the matter to a good direction, but from this event, there was a big harm done to the many exhibiting businesses and mostly the people in the retail business trade who were invited.  Even in the recession time, (they) spent a lot of time and money in order to be present; many people expressed their anger saying that (you, they) even ignored, but ignored too much.  (They) expressed saying that they realized anew that they looked infinitely insignificant.

**Representative Lee:**  I heard that kind of statement many times also.  But any kind of incident has both sides; and (one) could have a different opinion.  There were many buyers that sad that we did well; you must teach them a lesson.  Of course, there is a time we must use force for the righteousness, and there is a possibility that an exception will certainly follow whenever we do something.  (I) think the important thing is only that which direction we are going.  The power is like a gift if we apply it in a good direction, but if we apply it in a bad direction, it becomes a violence.

I would like to look at from a good perspective that the power that the wholesale businesses used this time is from the perspective of establishing the order of the market in our hair industry.  The beauty expo event had become a mess already.  That is already passed.  Our expo is a victim, the other exhibitors who participated, and the people who are in the retail business trade all paid a big sacrifice.  But I wonder if we have gained something through all of this sacrifice.

Not too long ago, the 3 reasons why the productions companies should not enter directly into the market were published in *Beauty Times*.  Their entrance will destroy the order of the existing market, and it could force all of our industry into a disaster.  Our industry is already supersaturated.  According to the experts' prediction, in this condition, the industry will blow up if the production companies enter

into the market directly.  The issue regarding the direct entrance of the factories is beyond certain situation or the influence of the competition; we need to think from the perspective that the survival of industry depends on this.

Especially our industry is not a industry that supply a simple products such as daily necessities to the consumers, but we are supplying the fashion and skills.  The direct entrance of Chinese companies is as work that is cutting away the sprout of a very important element, and there is a possibility that the factory itself can be destroyed.  It is the order of our industry that when the retail stores survive, the wholesalers will survive; and when the wholesalers survive the production factory will survive.  If one party wants only itself to survive and neglect the other two sides' function, then in the market order whole industry will be destroyed.

I discovered that through this crisis, *if the wholesalers and the retailers of our hair industry cooperate with each other, we can easily fulfill the function of maintaining this kind of order.  And for the first time the practical sense of sympathy was created this time*.

*   *   *

**Director Kwon:**  The Representative Lee has set up a good direction.  But I am concerned if that kind of beautiful mutual assistance will happen in this free market system where the maintenance is based on the human greed.  Wouldn't it be difficult to establish that kind of mutual assistance as long as there are businesses that are interested in their own benefits and not interested and insensitive about the market order even when they bring in and sell the products of the manufacturing factory's brand?

**Representative Lee:**  As long as there exist those kind of businesses.  But I certainly realize this time.  If there is a business that only considers its own benefit, and destroy the order in the market, then it needs to be clipped from the sprout.  It is hard to announce publically, but I was very exploded with anger.  I begged, almost with kneeled down knees, to the representatives of the business that brought the factory brand.  "Because of you, the beauty expo is about to be destroyed.  Please help."  Or even saying words like this, "The factory people are bad people.  When they make their own brand and sell it in the U.S. market; where are people who is causing the competition

with the businesses who import their own product?"  and begged for help, but they refused.  They responded, "If (you) won't let us display the product, then we will withdraw.  Then will you be responsible for all the effort that we put in for a long time in order to prepare for this show?"  Perhaps, if it is ordinary people, they will pretend to loose and had helped us.  Isn't it a business ethic to recognize each other's situation among same wholesalers?  I think that the attitude, which says that there is no legal problem and say such and such about the "law," and yet ignore the existing practices and atmosphere, and only think about their own profit, it not desirable in the advancement of the industry.  Wouldn't it be an attitude of a great business person that thinks that only when the whole industry advances, then their own portion will grow?

**Director Kwon:**  It seems like that the damage that was done to the beauty expo this time is very serious; how will you handle this?

**Representative Lee:**  I believe that the leaders of the hair industry will resolve well in the level of one who tied a knot must untie it.  If that kind of choice was inevitable in the level of the establishment of the order in the market, then wouldn't the problem be from now on?  I wish that the true women who are in every area of American beauty industry will use this as an opportunity to lead in order to participate in the common front.  Of course, I wish that it will be better if we can resolve together not only this issue regarding the entrance of the factory, but also unlimited product supply issue, which the existing retailers feel resentful and suffer the most.  My judgment is that only if we solve these two problems together, everything will be resolved; and the people who have the power to solve these are the wholesale hair import companies that are in forefront.

In addition to that, *Beauty Expo,* having a heritage of 15 years, is a pride of the beauty industry that Korean people first started in U.S.'s world-known convention city, Las Vegas.  It is established not only with the effort of the expo employee, but it is a creation that was made by all of the wholesale hair import companies together with the wholesalers of the beauty supply area, and other related businesses.  Wouldn't it be too bad if we destroy it in one moment?  For me, actually, it just takes too much effort: if I do well, that is it, and if I don't do well a little bit, I receive enormous criticism; it is a work that dries the blood, that I have to satisfy everyone every year.  But

because of the pride to continue the 15-year heritage and there is a possibility to progress into a world known hair show, I did it by looking only the forward with an endurance.

**Reporter Bae:**  It has been perceived from here and there about the fact that the issue of the production factory entering into United States is becoming very serious.  There are people who received generous offers from them for the big stores in good locations.  I wish that the retail industry will fully realize that there is a possibility of a fearful situation where the factory will directly enter into the retail business.

**Reporter Kim:**  *From now on, if there is a wholesaler that looks like helping the direct entry of the factory from the front or if there is any doubt even a little, the retail industry must completely refuse to purchase*.  The little leaking water will finally arrive at the bottom, and the reservoir becomes ruin.

**Representative Lee:**  Ultimately, for what happened at the *Beauty Expo* event this time, my responsibility is the biggest.  I couldn't predict and prevent this kind of disaster.  I sincerely apologize to everyone who was harmed.  And someday, I will compensate in any form.  In addition to that, to you buyers and guests who stayed until the end of the show, I want to express my gratitude and the respect from my heart (emphasis added).

## H.    *The NBSDA's campaign to Unite the Nation's Retailers*

136.   Following the success of the Planet Hair boycott in 2009 and Shin Ah Sah / Rebecca boycott in 2011, the NBSDA recognized that the nation's Retailers needed to permanently unite and work together if they were going to survive.

137.   In January 2012, the following NBSDA national resolution was published in Beauty Times:

From:        ***National Beauty Supply Dealers Association***

Title:         ***Establishment of Special Committee To Reinforce***

### *Retailers' Economic Power*

National Beauty Supply Dealers Association (NBSDA) established the special committee to reinforce the financial power of the retail businesses (committee chairman: Hae Soo Woo, 317-345-6958, email: vivanewoo@hanmail.net) because it had a discernment that there is a threat to the foundation of the beauty industry from the decline of the sales of the retail businesses due to the economic recession that is continuing in the United States and the recently surfacing issue of change in the distribution system among production, wholesalers, and retailers.

The purpose of the action of the Retailers' Economic Power Reinforcement Special Committee is

- To have multilateral conversations among the representatives of the hair product import industry (wholesale industry)

- to have direct and indirect conversations with the representatives of production companies

- To have conversations with the president of each regional beauty supply association

- To host the public forum with the retail businesspersons from each major city

Also, by analyzing how the recent changes in the distribution system will affect the retailers, and suggesting the direction and the method of the reinforcement of the economic power of the retailers, it will try to become the best guide for the profit of the members of the association. Thus, our association appointed Trustee Hae Soo Woo as the committee chairman, and announced the establishment of the committee that is composed of the experts within and without the industry.

We ask all of you who are affiliated with the industry for the cooperation, so that the Retailers' Economic Power Reinforcement

Special Committee of our association will come up with balanced comprehension of the situation for the whole beauty industry and will suggest the wisest direction for the future of the retailers in the whole United States.

138.   In furtherance of this call to action,  the NBSDA invited the AHIA to renew the Wholesalers' and Retailers' partnership, and the two associations met again to discuss how they could mutually protect their industry from further unwanted competition:

### Holding an Invitation Conference with Hair Industry (AHIA)

March 4, 2012. Executive Division of NBSDA, after having an informal meeting with the AHIA's executive team of the previous president Chan Shik Park in New Jersey on Monday, January 23rd, invited and held the first formal conference with AHIA's executive team of newly elected president Yong Bum Ku on February 13th at the NBSDA Association's conference room located in New Jersey. That day, NBSDA presented the recent issue of the industry concerning the problems of the Chinese wholesale businesses and the difficulties that the retailers are facing.

139.   In March 2012, this newly reenergized enterprise and conspiracy turned its collective attention towards an aggressive price discounter in St. Louis. As the Beauty Times reported, Retailers in St. Louis were angry about a buy-one-get-one-free sales promotion announced by a local Arab-owned beauty supply chain:

*"Retailers in St. Louis Are Angry"*

*100% Present at the "Let's Put Business in Good Order"*
*Emergency Response Meeting*



March 26, 2012.  Last March 8 at 8 p.m., the association of St. Louis beauty supply (Chairman Soo Ryong Lee) being the mandrel, almost 100% of beauty supply business owners that are not only the members of NBSDA and ABSA, but also the non-members of the associations have gathered in the Korean Restaurant in St. Louis (36 people, about 60 stores).  It was in order to have an emergency meeting to respond regarding the insensitive opening and price dumping of the recently surfacing known to be Arab H Store.  After having heated discussion where the number and length of the participants speaking needed to be regulated, they unanimously decided to form an emergency response committee.

*   *   *

The committee chairman Soo Ryong Lee expressed that the senseless act of H Store's price destruction is a problem that affects beyond the Korean beauty supply businesses: it is a problem that will determine whether or not all of the St. Louis beauty supply market will survive. . . . [T]he business owners that were present at this meeting

sympathized that the cause of this kind of problem to rise is the major hair wholesalers.  In other words, the problem was caused by the major hair product wholesalers' sales plan that is not keeping with the principle, aimed to enlarge their market without considering the new business that was senselessly opened near the existing Korean buyer.

In addition to that, he denounced, "They commented and request to block the advance of the Chinese production companies, and asked for help from the retailers; and yet they themselves don't think about their people and is busy just to gain their own profit."

*From this meeting, they appointed 5 emergency response officers and unanimously determined that they will participate 100% on the items that had been decided by the committee; and with one voice, they said, "From now on, (we) will take active action with joint steps to the items that are decided by the committee."* (emphasis added).

140.   Through the combined efforts of the Wholesalers and Retailers, the Retailers were able to stamp out price discounters, online retailers and other potential competitors -- including Plaintiff -- which, in turn, allowed the Retailers to continue to make substantial profits from the sale of human hair.

## I.   *The Defendants' Unlawful Enterprise, Combination and Conspiracy*

141.   Following the Wholesalers' and Retailers' successful collaborations in 2012, industry leaders began meeting regularly to devise appropriate courses of action for the industry as a whole.   This combined horizontal and vertical combination, enterprise and conspiracy is an especially potent barrier to entry that completely undermines the U.S. philosophy of free enterprise.

142.   As usual, Beauty Times memorialized these momentous meetings:

*Dealing with the Issues Regarding the Increase of the*

### *Human Hair Prices, Box Deal, and Online Price Break*

On February 13th, *National Beauty Supply Dealers Association* (NBSDA), president: Bu Ho Chu) invited *American Hairgoods Importers Association* (AHIA) and held a conference regarding the pending issues of the industry in the conference room which is on the second floor in Pine Plaza which is located in Palisades Park, New Jersey.

The agenda of the conference are the countermeasure for the increase of the price of the human hair, the problems of box deal, online price break, and the protection of dominant power in the market in a zone. Seven AHIA members who attended the conference on that day are President Chan Shik Park (chief executive officer of Oradell), Vice President Yong Bum Ku (chief executive officer of Boyang), Eastern Regional Vice President Sung Sam Hong (chief executive officer of [UNIKO]), Chang Moo Lee (chief executive officer of  Beauty Plus), Yong Bo Yoon (chief executive officer of Modu Trading),  Kyong Ho Choi  (chief  executive  officer  of  Hair  Zone),  Hyun  Joon  Kim (president of New Jigu Trading Co.).

From NBSDA, President Bu Ho Joo, Chief Vice President Jung Hyun Yoo, New Jersey Chairman Yong Jung Kim, Manager Hye Soo, Chairman of Modification Department Jae Choon Lee, Consultant Hyun Suhk Chang were present.  ***Both parties, by creating a bond of sympathy that they must win-win, agreed that in order to maintain the quality of the human hair market and appropriate prices, the market distribution system must be a place where it is reasonable and can be organized effectively.  Participating people of both parties ended the place with a firm handshake promising the hope of "win-win."*** (emphasis added).



143.   Unless and until these meetings and coordinated industry practices are enjoined, prices and competition in the U.S. beauty supply market will continue to be fixed and artificially manipulated by the Wholesalers and Retailers.

## J.   *Defendants' Illegal Combination, Conspiracies and Enterprise has Injured Competition*

144.   *The combination and conspiracy of the Wholesalers* has injured competition by creating an artificial concentration of power in the wholesale end of the market.   Through price fixing, price discrimination, coordination of payment terms, allocation of product and geographic markets and group boycotts, the Wholesalers, with and through Defendant trade associations, set and dictate the wholesale terms at which all human hair products in the United States are sold.

145.   The Wholesalers including Defendants also have erected numerous barriers to entry to protect the market from new entrants.

146.   Chief among these barriers are exclusive supply and distribution arrangements with the producers of all human hair in the world and all of the

Retailers in the United States along with the mislabeling of products containing animal hair and synthetic fibers as "100% human hair."

147.   By mislabeling these products, the Wholesalers are able to price their "100% human hair" products well below the wholesale cost of actual human hair; and when sold side by side, since a consumer cannot tell the difference, the consumer often purchases the mislabeled, lower priced product.

148.   Since potential competitors cannot purchase the mislabeled products since they are manufactured exclusively for use by the Wholesalers under each Wholesalers' private label or brand, potential competitors are forced to buy real human hair from Southeast Asia which costs ten to fifteen times more than the mislabeled hair products the Wholesalers have flooded the market with.

149.   These "apples to oranges" product and pricing differences are a significant barrier to entry.

150.   Additionally, the Wholesalers with and through Defendants "punish" any supplier who sells human hair to a competitor, by diverting orders to another supplier, or by collectively boycotting that supplier with the aid of other Wholesalers.

151.   Finally, the Wholesalers extend millions of dollars of credit and trade allowances to Retailers, but they do not offer these same incentives, terms and

discounts to other would-be competitors, which substantially increases rivals' costs of doing business in this market.

152. *The combination and conspiracy of the Retailers* has injured competition by eliminating free and open competition in the sale of human hair products in the United States. Through regional price fixing agreements, agreements not to compete and group boycotts, the Retailers collectively influence the retail prices all human hair products are sold at.

153. The Retailers set prices, agree not to compete with each other and prohibit discounting through the NBSDA's 30 regional chapters. Because a Retailer must be a member of the NBSDA (or ABSA) to obtain products from the Wholesalers, membership in the NBSDA (and ASBA) -- which is restricted to Koreans -- is a significant barrier to entry.

154. The combination and conspiracy of the *Wholesalers and Retailers* together has created an enterprise that completely eliminates competition in the market for the sale of human hair. In addition to each of the restraints and entry barriers outlined above, the Wholesalers and Retailers together are able to exclude competitors and protect the entire U.S. market for human hair substantially for themselves.

155.   As detailed in the above examples, with the assistance of the Retailers, the Wholesalers were able to block attempts at entry into the market by even well-financed Chinese producers.

156.   Similarly, with the assistance of the Wholesalers, the Retailers were able to block entry by a competitor who had contracted to sell beauty products inside Walmart -- the nation's largest retailer.

157.   These examples show the true power of the Wholesalers' and Retailers' mutual enterprise.

158.   The combined Wholesaler-Retailer combination, enterprise and conspiracy controls at least 90% the relevant product and geographic markets.

159.   The Wholesalers' and Retailers' joint enterprise and activities also fosters numerous illegal activities.

160.   For example, the Retailers insist on doing business in cash, to avoid having to report the full extent of their sales and to avoid the full imposition of income taxes and sales taxes.   But for the Wholesalers' and Retailers' joint enterprise, the Wholesalers would never allow this.

161.   Similarly, the Wholesalers have made millions of dollars by collectively mislabeling their products and by augmenting these products with adjuncts like animal hair.  The Retailers know this is happening and would like to

stop it, but in furtherance of their mutual enterprise, the Retailers allow these practices to continue.

162.   Until free and open competition is restored in this industry, the Wholesalers and Retailers will continue to exclude potential competitors and break the law, and as a result of the foregoing activities, the prices and supply of human hair products in the U.S. will continue to be unlawfully manipulated.

## RELEVENT PRODUCT AND GEOGRAPHIC MARKETS

163.   The relevant product market includes all packaged and brand name human hair products imported or sold in the United States, including hair extensions, braids, weaves, wigs and similar beauty supplies.

164.   Because much of the human hair sold in the United States contains synthetic or animal hair in varying amounts, the relevant product market includes all hair products advertised or labeled as including human hair or containing "100% human hair" regardless of the product's actual origins or composition.

165.   The Wholesalers and Retailers control virtually the entire supply of human hair in the United States and they collectively possess a market share approaching 100%.   There are few, if any, real substitutes for the human hair products in question and competing wholesalers or retailers of beauty supply products have been unable to obtain sufficient quantities of human hair to actually compete with the Defendants on any meaningful level.

166.   The relevant geographic market includes the entire United States, but human hair is predominately sold in major metropolitan areas, including: Detroit, Atlanta, St. Louis, New York, New Jersey and Los Angeles.

167.   The location and membership of the NBSDA's 30 regional chapters, *supra*, approximates the relevant geographic markets at issue in this case.

168.   Human hair is also sold through some online internet retailers, but since the Wholesalers can and do moderate the amount of human hair sold online, online sales and retailers do not meaningfully impact the price or availability of relevant products in the relevant geographic markets.

## EQUITABLE TOLLING

169.   Defendants and their co-conspirators have gone to great lengths to conceal their illegal activities.  Their concealment efforts include doing business only with other Korean businesses and business people; doing business predominately in cash; doing business in person; speaking and communicating about business matters predominately in Korean; setting up private associations, websites and trade publications to share information; and operating as closely-held unincorporated businesses.

170.   Defendants' trade publications urge Korean business owners to use these secrecy tactics to maintain Defendants' control over the market and to exclude would-be competitors and unwanted government scrutiny.

171.   Further, because most of the activities challenged in this case involve racketeering it is unreasonable to expect outsiders like Plaintiff to be able to uncover the existence or full extent of this conspiracy on their own.

172.   Because Defendants and their co-conspirators have purposefully concealed their illegal enterprise, combination and conspiracy, any applicable statute of limitations should be tolled to the fullest extent allowed by law.

## COUNT I

## VIOLATIONS OF THE RACKETEERING INFLUENCED CORRPUT ORGANIZATIONS ACT

### Against Each Defendant and Each Yet To Be Named Member Co-Conspirator

173.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

174.   Defendants, by, through and on behalf of their membership, have jointly and collectively engaged in and operated an illegal enterprise in violation of the federal Racketeer Influenced and Corrupt Organizations Act (RICO).

175.   The enterprise consists of among other things, a joint combination and conspiracy among the Wholesalers and Retailers, which allows the enterprise to accomplish things that neither the Wholesalers or Retailers as a group could accomplish alone.

176.   Since at least 2008, Defendants and their members have used the enterprise to, among other things, exclude potential wholesale and retail competitors, and to engage in a variety of illegal and criminal activities.   These activities include:  money laundering, mail fraud, tax evasion, customs fraud and product mislabeling.

177.   As part of their enterprise, Defendants and their members encourage the use of unreported cash payments.   These transactions violate U.S. money laundering rules and allow the Wholesalers and Retailers to illegally export money from the country without the government's knowledge.

178.   Violating cash transaction reporting rules and aiding and abetting a money laundering scheme of this magnitude is a criminal act and constitutes a RICO predicate act.

179.   As part of their enterprise, Defendants and their co-conspirators use the U.S. Mail and commercial package delivery services to collect cash and deliver mislabeled products and goods.

180.   Knowingly using the U.S. Mail and/or commercial package delivery services to commit criminal or illegal acts is a RICO predicate act.

181.   Defendants' and their co-conspirators' enterprise and money laundering schemes allow millions of dollars of beauty supply sales revenues to go unreported.   These underreporting of revenues reduces the amount of income taxes

and sales taxes paid by Retailers and makes these businesses significantly more profitable than a would-be competitor (like Plaintiff).

182. Defendants' and their members' tax evasion and tax avoidance schemes are illegal and constitute a RICO predicate act.

183. As part of their enterprise, Defendants' members knowingly import products labeled as "100% human hair" into the country without declaring that many of these products actually contain animal hair. Animal hair is a highly regulated and restricted product.

184. Failing to comply with U.S. Customs regulations and knowingly concealing the true composition of products being imported into the United States is a crime and constitutes a RICO predicate act.

185. Defendants' members also have made false and/or misleading statements of fact concerning their products, including that such products contain "100% human hair" when, in fact, they do not.

186. The statements, advertisements and labels used by Defendants' members actually or impliedly tend to deceive a substantial portion of the intended audience, including consumers and other end-users of the products.

187. The statements, advertisements and labels used by Defendants' members are material to consumers and end-users' purchase decisions.

188.   The statements, advertisements and labels in question were introduced into interstate commerce.

189.   There is a causal link between the challenged statements, advertisements and labels and the harm to the Plaintiff.  Had consumers and end users been aware that most of Defendants' and their co-conspirators' hair products contain animal hair or synthetic fiber, consumers and end-users would not have purchased those products.

190.   The statements, advertisements and labels used by Defendants' members violate of the federal Lanham Act, 15 U.S.C. § 1501 *et seq.*, and constitute a RICO predicate act.

191.   Defendants have promoted and facilitated the illegal conduct described herein and are jointly and severally liable for the concerted and coordinated actions of their members.

192.   Defendants possess records and information sufficient to identify each additional member of the conspiracy.  When such information is eventually produced, Plaintiff will seek leave to add those members to the Complaint as additional co-conspirators.

# COUNT II

## *PER SE* UNLAWFUL COMBINATIONS AND CONSPIRACIES IN VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT

### Against Each Defendant and Each Yet To Be Named Member Co-Conspirator

193.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

194.   The Wholesalers and Retailers, together, and as two separate groups, through their respective trade associations, have fixed prices, allocated markets and engaged in group boycotts and refusals to deal.

195.   The agreements and practices challenged in this Count are exclusively horizontal, meaning that only Wholesaler-Wholesaler or Retailer-Retailer actions, combinations or conspiracies are involved.

196.   For example, the Complaint alleges horizontal price fixing, market allocation (e.g., the 1 mile rule) and a group boycott by the Retailers of a Chinese manufacturer who sought to enter the market.

197.   The Complaint also alleges horizontal price fixing, market allocation and a group boycott by the Wholesalers of Plaintiff and other would-be retail competitors.

198.   Activities, combinations and conspiracies among competitors at the same level of distribution are horizontal restraints and are illegal *per se*, meaning that the illegality of these actions is presumed.

199.   The illegal, horizontal activities challenged in this Complaint violate Section 1 of the Sherman Act and should be enjoined.

200.   Defendants have promoted and facilitated the illegal conduct described herein and are jointly and severally liable for the concerted and coordinated actions of their members.

201.   Defendants possess records and information sufficient to identify each additional member of the conspiracy.   When such information is eventually produced, Plaintiff will seek leave to add those members to the Complaint as additional co-conspirators.

## COUNT III

## UNREASONABLE RESTRAINTS OF TRADE IN VIOLATION OF SECTIONS 1 AND 2 OF THE SHERMAN ANTITRUST ACT

### Against Each Defendant and Each Yet To Be Named Member Co-Conspirator

202.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

203.   The Wholesalers and Retailers, together, and as two separate groups, through their respective trade associations, have fixed prices, allocated markets and engaged in group boycotts and refusals to deal.

204.   The agreements and practices challenged in this Count include cooperation by vertical competitors, meaning the Wholesaler-Retailer and Retailer-Wholesaler actions, combinations and conspiracies.

205.   For example, the Complaint alleges a vertical combination of Wholesalers and Retailers intended to corner the market and preserve the profits and business of the U.S. beauty supply industry solely for the benefit of Koreans and/or Korean-Americans.   These actions constitute an illegal attempt to monopolize.

206.   The Complaint also alleges vertical supply and output arrangements, and vertical credit and trade term arrangements that exist only because the Wholesalers and Retailers have combined and conspired to operate and protect their mutual interests and enterprise.

207.   Under the antitrust laws, vertical activities and combinations like these are illegal if they unreasonably restrain trade in a relevant product and geographic market.

208.   The relevant product market is the U.S. market for human hair and human hair products, regardless of these products actual composition.   The

relevant geographic market is the United States since all of the hair products at issue are imported from Southeast Asia.

209.   Defendants control 85% of the U.S. beauty supply market, and their dominance in the market for human hair is even higher.

210.   As Plaintiff's experience and other examples cited in this Complaint demonstrate, Defendants' and their members' actions and policies have restrained trade and eliminated competition in the market for the sale of human hair, including the elimination of Plaintiff as a competitive threat.

211.   The vertical activities challenged in this Complaint unreasonably restrain trade in violation of Sections 1 and 2 of the Sherman Act and should be enjoined.

212.   Defendants have promoted and facilitated the illegal conduct described herein and are jointly and severally liable for the concerted and coordinated actions of their members.

213.   Defendants possess records and information sufficient to identify each additional member of the conspiracy.   When such information is eventually produced, Plaintiff will seek leave to add those members to the Complaint as additional co-conspirators.

## PRAYER FOR DECLARATORY & INJUCTIVE RELIEF

214.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

215.   On behalf of himself and all others similarly situated, Plaintiff requests that this Honorable Court:

>   A.   Adjudge and decree that Defendants and their members are engaged in one or more illegal enterprises under the Racketeering Influenced and Corrupt Organizations Act;

>   B.   Adjudge and decree that Defendants and their members are engaged in *per se* unlawful and/or unreasonable restraints of trade in violation of Sections 1 and/or 2 of the Sherman Act;

>   C.   Permanently enjoin Defendants and their co-conspirators' illegal activities to the fullest extent allowed by law.

## PLAINTIFF-SPECIFIC ALLEGATIONS

216.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

217.   Through the 1990's, Plaintiff successfully operated several retail clothing businesses in Detroit and New York.

218.   In 2011, Plaintiff started a business known as The Hair Factory and began selling beauty supplies at a store on 7 Mile Road in Detroit.  Plaintiff's personal investment in the business exceeded $300,000, and the company enjoyed initial success as it is one of the only Black-owned beauty supply stores in Metro-Detroit.

219.   From the outset, Plaintiff knew that he needed to sell human hair to be successful. Plaintiff spent 3 years investigating and trying to find a supplier of human hair that would sell him human hair.

220.   The major Wholesalers refused to sell human hair to Plaintiff at any price.

221.   In 2010, Plaintiff travelled to China in search of suppliers for human hair and wigs.  Each of the Chinese suppliers Plaintiff spoke to refused to sell products to Plaintiff (a Black individual) stating fear of reprisal by the major Korean Wholesalers.

222.   In 2011, Plaintiff made a second trip to China and was eventually able to contract with a small, start-up supplier to purchase human hair.  Even so, the price Plaintiff pays for human hair in China is substantially higher than even the *retail price* of most hair products sold in the United States, due to the mislabeling practices and strong supplier relationships explained above.

223.   Plaintiff, therefore, is forced to compete with the myriad of mislabeled products being sold by Defendants' members, at a lower margin and without access to the Retailers' distribution network or any of the trade allowances and support that is offered by the Wholesalers.  Plaintiff also is not invited or allowed to attend the national beauty supply expos, where new products are displayed and sold.

224.   But for Defendants' and their members' group boycott and collective refusals to deal, Plaintiff could have saved the tens of thousands of dollars Plaintiff spent trying to find an alternative human hair supplier.

225.   But for the Defendants' and their members' group boycott and collective refusals to deal, Plaintiff could have saved tens of thousands of dollars Plaintiff spent locating financing and trying to duplicate the trade allowances and discounts that Defendants' members freely give to other Retailers.

226.   But for the Defendants' and their members' group boycott and collective refusals to deal, Plaintiff could have begun selling human hair in a free and open market at least three years earlier.

227.   But for the Defendants' and their members' group boycott and collective refusals to deal, Plaintiff could have begun selling online through its internet site at least three years earlier.

228.   But for the Defendants' and their members' group boycott and collective refusals to deal, Plaintiff would have grown to become one of Detroit's largest beauty supply retailers.

229.   As Aron Ranen's documentary and the BOBSA articles cited in this Complaint demonstrate, Black customers prefer to support Black-owned beauty supply stores like Plaintiff's, but few such stores exist in this country, and even

fewer are able to offer the full range of beauty supplies offered by the Retailers, including human hair.

230.   Furthermore, because Defendants and their members spend millions of dollars per year creating brands of human hair and advertising those products, and because those products are only sold to and through the Retailers, Plaintiff is unable to compete at all in the market for brand name hair products.

231.   Because of Defendants' and their members' advertising and mislabeling, consumers incorrectly believe that brand name hair products are superior and of a higher quality, when, in fact, independent laboratory testing has shown that they are not.

232.   The group boycott, refusals to deal and other illegal activities alleged in this Complaint have injured Plaintiff in his business and property in an amount to be proven at trial.

## **PRAYER FOR LOST PROFITS & TREBLE DAMAGES**

233.   Plaintiff re-alleges all of the preceding paragraphs as if fully set forth herein.

234.   On behalf of himself, Plaintiff requests that this Honorable Court:

A.      Enter judgment against each of the Defendants, holding Defendants jointly and separately liable for the full extent of the violations alleged herein, including the actions of their members; and

B.    Award Plaintiff treble the amount of damages actually sustained by reason of the violations alleged herein, plus the costs of this action including attorneys' fees; and

C.    Award Plaintiff interest on his damages, plus such other relief as may be proper in law or equity.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 16, 2014

/s/ Jason J. Thompson
Jason J. Thompson (P47184)
Lance C. Young (P51254)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, MI 48076
(248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com

Kimberly T. Brown (P41835)
13335 15 Mile Rd. #157
Sterling Heights, MI 48312
(586) 216-6499
ktbrown88@aol.com

*Attorneys for Plaintiffs*